Appeals number 4-16-0288, People v. Charles Brown. Appearing for the appellant is attorney Bradley Jarka. And for the appellee is attorney James Ryan Williams. Good morning. Mr. Jarka, are you ready to proceed? You may.  Again, my name is Brett Jarka from the Office of the State Appellate Defender, and I'm here on behalf of the petitioner appellant Charles Brown. Mr. Brown's post-conviction petition is the exact kind of petition that the Post-Conviction Hearing Act contemplates will be resolved after an evidentiary hearing. It attaches evidence from outside the original trial record that speaks directly to the issues at the heart of Mr. Brown's trial, the litigation of the pretrial motion to suppress the recorded statement that he gave to Detective Shepard, and the demonstrable effect of that statement on the jury. And in fact, every person to consider Mr. Brown's petition, from defense counsel, to the state, to Judge Clem, and even at one point, Judge DeFanis, had either affirmatively decided or acquiesced in the decision to advance that petition to an evidentiary hearing. And yet, that hearing never took place. Instead, Judge DeFanis' sua sponte decided to reconsider the state's motion to dismiss and dismiss the petition on the grounds of legal insufficiency. This court should reverse the second-stage dismissal of Mr. Brown's post-conviction petition and remand for the third-stage evidentiary hearing that Judge Clem had already set, and for which the parties had already begun to prepare. And it should do so for any of three independent reasons. First, the circuit court erred when it dismissed the petition on the grounds of legal insufficiency after the state had filed its answer. Second, Judge DeFanis erred when he sua sponte decided to revisit the partial denial of the state's motion to dismiss, where he did so without compelling reasons or careful consideration, and where he was not correcting a clear error or manifest injustice. And third, and regardless of the procedural errors in this case, Mr. Brown's petition made a substantial showing that trial counsel's litigation of the pretrial motion to suppress was ineffective. I do intend to address all three arguments this morning, paying particular attention to arguments two and three. But of course, I'm happy to take questions on any of the issues at any time. But turning first to argument one, the key to the litigation of post-conviction petitions, once they advance beyond the first stage, is that the proceedings be initiated by some sort of adversarial process. And under People v. Thompson, the choice between the adversarial processes that may be initiated is largely up to the state. The Post-Conviction Hearing Act expressly provides that once the petition is docketed for second stage proceedings, the state may either file an answer or move to dismiss. And People v. Thompson clearly holds that once the state files its answer, dismissing on the grounds of legal insufficiency is error. This case and Thompson aren't alike, though, in the sense that in this case, the state filed a motion to dismiss, and in Thompson, the state did not. It just simply filed an answer. In this case, you have a trial court reconsidering its prior ruling on the motion to dismiss, and that's not what happened in Thompson, true? That is correct. It's our position that that's no more than a technical difference, though. Because under the Post-Conviction Hearing Act, Section 122-5 in particular, even after the state's motion to dismiss is filed and denied, there's still an avenue for the state to seek further consideration of the petitions on the ground of legal insufficiency by filing a further pleading on motion to the circuit court. We cited a couple of cases in the briefs, not so much for the legal propositions that they espouse, but to show that. How do you reconcile your position with the case law that says the trial court has the inherent authority to reconsider its prior rulings? So the reconciliation, I think, really comes with the policy position that the Illinois Supreme Court and the appellate courts have espoused when it comes to litigation of post-conviction petitions in particular. So we know from People v. Coleman that when petitions like Mr. Brown's that attach evidence from outside the original trial record are advanced to the second stage, it's not the intent of the Post-Conviction Hearing Act that they be resolved on the pleadings. And so when we take the aim of the Post-Conviction Hearing Act in that way, combined with the Post-Conviction Hearing Act's clear allowance for the state to continue to attack the proceedings or the petition on the grounds of legal insufficiency, I think that leads us to the conclusion that the proceedings on Mr. Brown's case were substantially similar to that in Thompson, where the state still had the choice between moving the court to reconsider the denial of the motion to dismiss and filing its answer. So the state sits at the same apex position in the proceedings on the motion to dismiss, the same diametric choice between continuing an attack to the petition on the grounds of legal insufficiency and filing an answer and sending the case to an evidentiary hearing to be resolved on its facts. And again, turning to broader post-conviction law more generally, People v. Pendleton also makes clear that the standard of the second and third stage is largely the same. So really the only difference is the amount of information that the circuit court is gonna consider when it's considering. The second trial judge certainly ought to have the ability to correct what may have been a clear mistake in the original ruling. Well, and that is true, I suppose. And that brings us to argument two, I guess, which is that regardless of the state's litigation position, it's our position that the second judge erred when he decided to spontaneously revisit the state's motion to dismiss. And so it's true, as the state points out, and as we acknowledge in our briefs, that the general rule is that the trial judge does have that inerrant authority to reconsider, modify, or vacate rulings by predecessor judges. But Balkunis v. Duff makes clear that that authority is not unlimited and comes with certain caveats. And those caveats in particular are that prior ruling should only be really reconsidered after careful consideration and for compelling reasons. And the successor judge should exercise considerable restraint when deciding to reconsider a prior order by his equal. And he should not reverse simply because he disagrees with the first judge's ruling. There must be some evidence that the first ruling was clearly error or was working some kind of manifest injustice. And in this case, the second judge's ruling on Mr. Brown's post-conviction petition does not show careful consideration or provide us with any compelling reasons that Judge Clem's initial decision might need to be reconsidered. And we've laid out several contentions in our brief as to the errors that the second judge made when he was ruling on the reconsideration of the state's motion to dismiss. My reading of the state's brief is that they haven't really addressed any of those errors. But just briefly, the second judge addressed the one act, one crime issue, which was not present in Mr. Brown's post-conviction petition and which this court had already resolved on direct appeal. The second judge only expressly considered the trial court's error in the denial of the motion to suppress and then found that that error was res judicata, even though this court had not considered the motion to suppress issue in any form on direct appeal. And the fourth error is that the second judge applied the first stage patently without merit standard to the second stage proceedings on the post-conviction petition. And one of the cases that we cited, people versus $280,020 of the United States currency, which is in the same procedural posture, a motion to dismiss posture, specifically cited the consideration of the wrong legal standard as one of the reasons that it would be error for a successor judge to reconsider a prior judge's prior ruling. And then there are a couple things that I think it's important to emphasize about the proceedings on the reconsideration of the state's motion to dismiss. And that is that the second judge wasn't really presented with anything new in terms of facts or argument from the original hearing on the state's motion to dismiss. So we've made a cross comparison in the briefs as to the arguments that the state made at the first hearing and the arguments that the state made at the second hearing. And really the only difference between the first and second hearings is that the state's argument at the second hearing was in fact much shorter. And then perhaps the most critical aspect of this issue is that the second judge had already begun substantially assisting the parties in preparing for the evidentiary hearing. So on February 22nd, 2016, which I believe if my recollection of the record is correct, that's the first time that the second judge was sitting on the call. Defense counsel came to the court and explained that it was having trouble getting witnesses from Carl Hospital to the evidentiary hearing. The doctor and two of the nurses had moved out of state. And the state would not agree to have experts, or to have doctors and nurses who were still at Carl Hospital come in and testify as experts about the effect of the medications that were listed in the medical records. And Carl Hospital had given defense counsel an estimate of $6,000 to $8,000 for bringing the doctors and nurses in from out of state. And in response to that concern, the second judge expressly ordered Mr. Prino, who was acting as conflict counsel for the public defender's office, to nonetheless issue the subpoenas for those out-of-state witnesses anyway, bringing them to Illinois and preparing to conduct the evidentiary hearing that the first judge had already said. And so taking his initial willingness to consider the petition at a third-stage evidentiary hearing combined with the reasons that we've argued are insufficient for reconsidering Judge Clem's order, it's our position that this court should reverse on the grounds that it was error for the second judge to reconsider. Are you arguing some sort of estoppel on the part of the trial judge that because he had communicated maybe that this was going to proceed to a hearing that he couldn't look to see if there were deficiencies, justifying dismissal? No, so we're not arguing estoppel. So People v. Williams and People v. De Jesus make very clear that this type of common law equitable doctrine is not grounded in any of the traditional estoppel doctrines. So it's not- So why couldn't the trial judge, the second judge, identify that there were no affidavits attached to the post-conviction petition and dismiss because it was deficient for that reason? Well, I think in theory, a trial judge could do that. So Balcunas, again, operates from the general rule that it is proper for a successor judge to reconsider, modify, or vacate the prior orders of his predecessors. But there's limits placed on that. So if the first judge's order was clear error, say, for example, in the situation Your Honor has posed, where there are no affidavits attached to the petition under established law, it would be error to advance the petition even beyond the first stage, perhaps. Then it becomes proper, then, for the second judge to come in and say, I'm correcting a clear error. Here are my compelling reasons why this petition should not go forward to an evidentiary hearing. It's our position that we simply don't have that in this case. But you don't have affidavits from the medical personnel supporting the post-conviction petition, do you? That's correct. We don't have affidavits from the medical personnel. We do have the medical records themselves, though, which indicate the types of medication that Mr. Brown was prescribed, which goes directly to what he testified to at the suppression hearing. It confirms that testimony. And we have affidavits from Mr. Brown and his girlfriend explaining the effect of those medications on him. And then we have the affidavits of trial counsel explaining why he didn't invoke those medical records at the suppression hearing. But I think that actually provides a good transition to argument three, which is the merits of the petition, explaining how, regardless of any procedural error that may have taken place in this case, Mr. Brown's petition did make a substantial showing that trial counsel's litigation of the pretrial motion to suppress was ineffective. There's no dispute about the standard, the second stage standards, or the Strickland standard in this case. And so we, as far as the law, and so in order to make a substantial showing that counsel was ineffective, defendant must show that there was a reasonable likelihood that the outcome of this trial would have been different and that the outcome of the litigation on the motion would have been different, and that counsel performed efficiently in the first place. So turning, as the state does first, to the outcome of the trial, the prejudices of the outcome of trial. The state's brief really doesn't address the key element of the prejudice at the trial that is present in this case. We're in an unusual circumstance where we don't have to guess about what the jury was thinking about in the jury room based on some of the questions that they sent out during their deliberations. So they sent out a question expressly asking for the interview with Detective Shepard to be played again, and they were brought back to the court and it was indeed played again for them during their deliberations. And so we know that regardless of anyone else's position on the closest of the evidence, the state was not so convinced by the remainder of the trial evidence that it found the reported statement irrelevant. And that's true because Mr. Brown's statement was the only direct evidence from trial that affirmatively placed him in the relevant house at the time that the shots were fired. And the remaining evidence that the state describes as compelling, in fact, was not so. So the state points to the DNA that was on the inside of a ski mask found in the bushes next door. Of course, that DNA was not, the DNA from which Mr. Brown's profile could not be excluded was not the only contribution on the inside of the mask. And there's no evidence about how the mask came to be in the bushes or when it ended up there. And then the state also points to Mr. Brown's injuries, and there are a couple of things that are important to remember about what is not in the record about Mr. Brown's injuries. So the ballistics testimony is really, really unclear as to matching bullets or shell casings to injuries or bullets and shell casings to guns. And that's because there were no guns ever recovered and there's no testimony about any bullets that may or may not have been recovered from Mr. Brown and any ballistics matching showing that his injuries were caused by the specific firearms that were involved in the shooting at 1106 West Eureka. And then we also know that there was a substantial amount of time without taking Mr. Brown's statement out of it, there was a substantial amount of time during which Mr. Brown's activities were not accounted for on the night that the offense took place. So we know that he was dropped off at a middle school in Champaign between six and seven o'clock p.m. We know from Lillie Seal's testimony that the intrusion to her house occurred sometime shortly after 7.15. And we know that the first officer was dispatched to the scene sometime around 7.30. And when he arrived, Mr. Brown was no longer present. So there's a time from as long as 6 p.m. to about 7.30 p.m., where absent Mr. Brown's statement, there's no evidence in the record at all about where he was, who he was with, or what he was doing. And then turning to the prejudice as to the result of the motion to suppress hearing, the key to this inquiry is really to match up what's attached to Mr. Brown's post-conviction petition and the circuit court's findings in denying the motion to suppress. So the trial court expressly commented on the lack of medical testimony about what medications Mr. Brown was on and what their effect was on him. Of course, we have those medical records now in the record as part of the post-conviction petition. And then the court had based its finding in large part on its credibility determinations. It found Mr. Brown incredible and Detective Shepard credible. And one of the reasons that it found Detective Shepard credible, and it focused in particular on his testimony that Mr. Brown had not been taken into custody, or hospital personnel had not been told that Mr. Brown was to be taken into custody until after the interview on October 5th. And of course, the medical records, regardless of any medical value they may have, directly contradict that testimony, explaining that hospital personnel was aware, at least as early as October 3rd, that Mr. Brown was not to be released into anyone's custody but the police custody. And so, and that really segues right into the trial counsel's deficiency. So the trial counsel, of course, attached an affidavit explaining that the reason that he did not invoke the medical record that the motion to suppress hearing was because of his own interpretation of what it meant to be alert and oriented in all spheres. We've suggested in our brief that a lay interpretation of that phrase in medical records may not be sufficient to speak to critically important aspects of what we might think of when we're thinking of an interrogation. The ability of someone to make important decisions for themselves in terms of waiving legal rights by talking to the police, and the ability to adequately and accurately recall events that had recently happened to them. And then, of course, medical records, as we've discussed, had their own impeachment value  was or was not in custody for the purposes of the motion to suppress. But the affidavit of trial counsel expresses a reason for why he did what he did. There's no counter affidavit from a medical person to explain your theory that the medical records actually would have demonstrated that your client was confused, groggy. So why couldn't the trial judge just simply take, is it Mr. Ortega? Yes, that's correct. Mr. Ortega's affidavit and rule on the post-conviction petition simply based on the affidavits that had been presented, defendants and Mr. Ortega's. Sure, so two answers to that. The defendant's affidavit, we would argue, is a counter affidavit. Now, it doesn't have the weight of a medical expert, but he did explain that the medications that he was on were making him feel groggy and sleepy and were impacting his memory. Tina Gordon, his girlfriend's affidavit, also makes similar explanations about what he was like when he was under those medications. And so, and then the second answer is that any disparity between Mr. Brown and his girlfriend's affidavit and defense counsel's affidavit is exactly the kind of factual dispute that should be resolved in an evidentiary hearing and not on the pleadings. So the credibility findings that would attach to Mr. Ortega's explanation for why he didn't invoke the medical records at the suppression hearing should be tested against Mr. Brown's assertion that the drugs that he was on were actually impacting him in a way that were significant to his ability to understand his waiver of his rights and his choice to speak to Detective Shepard. And so, in really all respects, there was good reason to advance Mr. Brown's post-conviction petition to an evidentiary hearing. There was a lot of evidence attached to the petition from outside the record. There are substantial credibility contests that should be resolved by adversarial testing and not by a simple review of the pleadings. And again, every person to review Mr. Brown's petition had at least at one point agreed to advance that petition to the evidentiary hearing. And so, whether this court finds procedural error or proceeds to rule on Mr. Brown's petition on the merits, we ask that this court reverse the second stage dismissal of this petition and remand for a third stage evidentiary hearing. If there are no questions, I would just save some time for rebuttal. I don't see any. Thank you, Mr. Ortega. Mr. Williams. Thank you, Your Honor. May it please the court. Counsel, my name is James Ryan Williams, and on behalf of the state's attorneys and fellow prosecutors, it is my privilege to represent the people of the state of Illinois before this honorable court. In thinking about this, it seems to me that really the first determination to be made here is whether the general rule applies that this court can affirm a second stage dismissal on any grounds substantiated by the record. And if that rule does in fact apply, then to me this case seems very simple because the defendant's complete inability to establish that he was even arguably prejudiced, let alone a reasonable likelihood based on counsel's failure to introduce this medical evidence. Given the overwhelming evidence of guilt, the result of the trial here would have been the same even if counsel did perform efficiently and even if the motion to suppress had been granted. Defendant, in this case, defendant and accomplice break into a family's home roughly 7.30, hold mother with three children up at gunpoint. Mother's boyfriend comes home, hears the commotion going on, retrieves a gun, comes in and shoots both the defendant and the accomplice each twice. They jump out of a window and at that point the defendant, circumstantial evidence, the defendant leaves a ski mask with his DNA in the bushes and unless I'm misreading the record here, the defendant's girlfriend testified that she picked him up roughly right after the shooting right outside the window to take him to the hospital where he was then treated for multiple gunshot wounds. So the defendant claims that his statement to the police was the only thing that put him at the scene of the crime but in making that assertion, defendant again ignores the fact, does not address the fact that the girlfriend and son picked him up just outside the victim's window nor does he address the fact that he's being treated minutes after the shooting at the hospital for multiple gunshot wounds. So it seems to me that he's essentially asking this court to believe his alibi that he's involved in this high stakes game of dice while simultaneously seeking to suppress that very alibi. You make a convincing argument in regards to lack of prejudice but why don't you address the first prong here and actually in advance of that, just from a procedural standpoint, the second trial judge's act of dismissing the post-conviction petition where it's been previously denied. And just to be clear, your honor, you'd like me to address the dismissal first? Yes, if you would. Okay, yeah, my pleasure. So with respect to these procedural errors, with respect to the state having filed the answer, the judge dismissing the petition, I believe that both of these errors are resolved by the court's inherent authority to reconsider its own non-final judgments such as interlocutory orders denying a motion to dismiss. Is there evidence of judge shopping here? Judge shopping? Is there evidence that the parties, the state in this case, just the case from Judge Clem and went to Judge DePonis in an effort to obtain a different ruling on this? I don't believe so, your honor. I have to apologize. I don't recall the reason that Judge Clem was absent. And I'm sorry, I don't want to speculate on what that reason was. I don't recall any sort of evidence of any kind of judge shopping. Well, what seems to me to be clear evidence that there was not was the fact that the state didn't request dismissal before Judge DePonis did the sua sponte. Is that right? That's correct. Okay. So with respect to the fact that the state filed the answer here, as your honor pointed out, I mean, admittedly, when the state files an answer, instead of moving to dismiss, the petition advances to stage three. But none of the cases that defendant cites here stands for the proposition that when the state answers after having moved to dismiss the petition, that that somehow divests the court of its inherent power to reconsider and correct its own judgments. And I suspect that the lack of case law on that point, as kind of discussed in the briefing, is because it seems that there's really no reason for such a rule because all it would really do is compel a judge to hold a hearing on a petition that he or she may subsequently, for reasons that he or she may subsequently determine, is not warranted. I mean, for example, when I leave here today, I'm gonna walk out of here, I'm gonna think of a hundred things I wish I would have said, right? And I suspect that similar things happen to judges as well. And the idea that by virtue of nothing more than the state following established procedure of filing the answer after the denial of the motion to dismiss, that that would somehow divest a trial judge from the inherent authority to reconsider a prior decision, I just don't see any purpose to be served by that rule. Now, the other thing that the defense takes exception to here is the fact that we do have a different judge here. But it seems based on the case law that that doesn't really matter. And that's especially true, whereas here we're dealing with a non-discretionary decision. And in fact, the Illinois Supreme Court in Peeble v. Johnson recently addressed a somewhat procedurally similar case. And without even address, without substantively addressing the fact that it was a different judge, the court held that there was not error in the successor judge reconsidering the prior judge's granting of leave to file a late post-conviction. And in reaching that decision, the court specifically noted the general rule that the court, that a court can vacate and correct its own interlocutory orders. Now, I would just draw the court's attention to page 29 of the defendant's opening brief and page nine of his reply brief. And he claims that in order for a judge to have, I guess it would be in order for a successor judge to have the ability to vacate a prior judge's orders. And I'll note, today he did use the word should, but in the briefing, if I recall correctly, he uses the word must. There must be clear error and there must, and this order must work a manifest injustice, but that's simply not true. The case that the quotes there, again, I don't wanna suggest that the quote's taken out of context, but if you read the case itself, it simply suggests that it's appropriate under those circumstances. But that doesn't make it a requirement. And in any event, I would submit that really, the prior decision granting the evidentiary hearing here was in fact clearly erroneous, again, because the defendant simply cannot establish prejudice here. Again, the evidence is overwhelming. Now, with respect to the deficient performance, prong one, as Your Honor suggested, I really, I mean, we have here, we have an affidavit from defense counsel explaining, I don't, forgive me, I don't recall, I don't think that he uses the word strategic, but he explains that he had a trial strategy, or excuse me, not trial strategy, but a reason for not introducing this evidence. And, and, that was because, when you look at the medical evidence, it consistently indicated that he was alert and oriented. And since we're dealing with what was basically a strategic reason here, the question really is, is whether this was so unsound that no reasonably effective attorney would have done it. And here, again, the medical evidence indicates that the defendant was consistently alert and oriented. That's, in my opinion, that is supported by the interview recording where he seems perfectly coherent. And that's also separately supported by the detectives, excuse me, the detective statements that, first of all, the medical staff, the medical staff repeatedly assured the detective that the defendant was in a condition to be interviewed. The detective talked about him speaking very coherently, having no certain speech, not appearing sleepy or drowsy, and quote, he seemed very aware of what was going on around him. And again, this is supported by the recording itself. So the fact that the defense attorney would not want to call in medical experts to talk about, you know, to testify, perhaps to the fact that, yes, we told him that he was in a reasonable condition to be interviewed, or that perhaps these drugs are not, you know, interfering with him, that just doesn't seem to be so unsound that no reasonably effective attorney would do that. Now, the other thing that the defendant points out here with respect to the attorney's failure to introduce this medical evidence is that, had he done so, he would have been able to prove that the detective lied outright about the date at which he indicated the defendant was to be arrested upon his discharge from the hospital. The notion that this is an outright lie is, I mean, clearly rebutted by the, if you look at the testimony, the officers asked the question, what was the date? He kind of pauses, speculates, and then he says that it was October, I may be reversing it, one was October 3rd, the other was October, in any event, this doesn't matter. Like, nothing suggests that the hospital staff in any way indicated to the defendant that he wasn't free to leave. This would seemingly have no effect on a custody analysis. The defendant speculates that possibly the staff told him. Well, similar speculation, it would make really no sense that the hospital staff would tell him, hey, by the way, you're gonna be arrested once you're discharged from here. I mean, that would invite the possibility of an escape attempt or possibly incite some sort of violence. I mean, it just makes no sense that the hospital staff would have done that. And in any event, we just have nothing on that point. And as Your Honor pointed out, the other thing is that we have no affidavits from the defendant in any way addressing, other than his own self-serving affidavits, in any way addressing the effect of these fairly standard pain medications, as I understand it. And so for those reasons, I would submit that the defense counsel did not even perform efficiently here. There is a perfectly valid strategic reason that he did not introduce this medical evidence because if anything, it may well have supported the denial of the motion to suppress. And then to that end, I don't think that it's even, that there's even a reasonable likelihood that the motion to suppress itself would have been granted. Even if the defendant was indeed medicated, and I apologize, as I think the defendant does correctly point out, I may have misread the medical records with respect to whether he was actually medicated on those days, but even if he was, in those same medical records established that the defendant's being attentive to his legal matters, asking to file a crime victim's application and asking the nurse to send a letter verifying his hospitalization because of an upcoming hearing, I believe in a different case. And by the way, he was discharged literally the day, he was discharged from the hospital the day after the interview. And then as noted, the detective testifies that the hospital staff assured him that the defendant was in an appropriate condition to be interviewed, he spoke coherently, no slurred speech, did not appear sleepy or drowsy, and was very aware of what was going on around him, all of which, again, is supported by the recording itself where, again, he seems perfectly coherent. So even if counsel happened to have performed efficiently, which the state's position is he did not, I just don't think that the defendant can show that there's a reasonable likelihood that the motion to suppress would have been granted. And even if the motion to suppress would have been granted, we, that is not the only evidence that puts him at the scene of the crime. We have his girlfriend testifying that she picked him up there. We have the fact that minutes after the shooting occurs, he's being admitted into the hospital with bullet holes in him. And unless this court has any further questions. I don't see any. Thank you, Your Honor. Thank you, Mr. Williams. Rebuttal argument, Mr. Jarkin? If you don't mind, if you could first address the prejudice argument that Mr. Williams made that there's no reasonable probability that the outcome would have been different, that the evidence being the homeowner shoots at two masked intruders. Defendant's girlfriend shortly thereafter finds a defendant lying in the yard next door to the victim's home with gunshot wounds. Police find a mask in the next door neighbor's bushes that have defendant's DNA in it or on it. So where's the reasonable probability that the outcome would have been different based on the ineffective assistance of counsel? Sure, so I think two responses to that question. The first is to situate the remaining evidence absent Mr. Brown's statement in the context of the charge that he was convicted of, which is home invasion. It requires an entry into the home. And so there's circumstantial evidence placing Mr. Brown near the home. He was recovered by his girlfriend from the yard. And there's no direct evidence absent the statement placing him inside the home, which would have been an essential element to a home invasion offense. And will we acknowledge that there is circumstantial evidence in the record, placing him near the offense at the time there was a shooting, near the home at the time there was a shooting. In the home, in the home. Well, there's circumstantial evidence. Via testimony, there's circumstantial evidence, but no identification that an individual was in the home. There's certainly direct evidence through testimony that two individuals entered the Lee Seals' home and committed the offense of home invasion. But there's only circumstantial evidence that Mr. Brown was one of those people. And his, so basically placing it in the broader context, his statement makes this case about a credibility contest instead of a burden issue. So it puts the jury to the task of deciding whether they believe Mr. Brown or believe the state as opposed to holding the state to its burden to prove beyond a reasonable doubt that he was the person in the home at the time of the offense. It was- I'm sorry, I'm not understanding the credibility contest. You said the credibility of Mr. Brown versus the credibility of the state. Right, so because Mr. Brown's statement places him in the home, but for a reason other than committing an offense, the jury would have been tasked with his statement to decide whether they believe that he was there for some innocent purpose, or whether it believed the remainder of the state's evidence that he was there for some sinister purpose. Without the statement, it simply, the case simply becomes one of putting the state to its burden to prove beyond a reasonable doubt that he was in fact the person who committed this offense. And the remaining circumstantial evidence was not even compelling enough to convince the jury to convict him without at least considering his reported statement again during deliberations. And just to transition briefly to argument to Justice Harris to address your question about evidence of judge shopping. No, there is no evidence of judge shopping. There's no evidence in the record that this was transferred to the second judge for any reason other than administrative purposes. But as we cited in the briefs, People v. DeJesus makes clear that the evidence of judge shopping is simply an aggravating factor. It is not an outcome determinative factor in deciding whether or not the successor judge acted properly in reconsidering the predecessor judge's order. Counsel, so are you indicating that your review of the record does not reveal why the transfer occurred? That's correct. As I read the record, I would be speculating like my colleague without going back through the record in detail. But my memory of the record is that there was no reason that suggested that any party affirmatively requested that this be heard in front of a different judge. And then to address the state citation to Johnson as the beginning and the ending of this case. So Johnson didn't discuss the limits placed on the general rule because it wasn't asked to, which is the position we lay out in our applied brief. But if the court reads Johnson carefully, we find that the first judge's decision ended up being error per the Illinois Supreme Court's decision on the timeliness issue. And the second judge actually put coherent reasons in the record for reconsidering the first judge's order. Namely that he found that the issue hadn't been adequately briefed and argued before. And so even though Johnson doesn't cite the limits on the rule, on the general rule like Balkunis v. Duff does, the second and first judges fit those limits exactly. The first judge's decision being clearly erroneous. And the second judge's decision being made given for compelling reasons and after careful consideration. And then the idea that those things must be true. The state takes issue with that on page 29 in our brief. We cited Christensen v. Cold Industries for that. And the actual quote is, courts should be loath to revisit prior decisions in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work to manifest injustice. So a must does not appear in that quotation, but the clear tenor of that quotation is that this is a stringent requirement on successor judges when they're reconsidering orders of predecessor judges with coordinate authority. And just like a successor judge would not want to be bound by the erroneous rulings of his predecessor, neither does a predecessor judge want his well-considered rulings to be flippantly disregarded by a successor. And so the- I'm sorry, but you're out of time. Oh, my apologies. We'll do that support to reverse. Thank you. All right, thank you. Thank you, counsel. The case will be taken under advisement and a written decision shall issue.